IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| BVCV HIGH POINT, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO. 2:21-CV-821-WKW |
| | ) | [WO] |
| THE CITY OF PRATTVILLE, | ) | |
| ALABAMA, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff BVCV High Point, LLC ("BVCV") owns undeveloped property in a mixed-use zoning area within the city limits of Prattville, Alabama.  In 2021, the Prattville City Council rezoned BVCV's property from R-4 (multifamily residential) to B-2 (general business).  Challenging the rezoning ordinance, BVCV sues the City of Prattville and the four members of the Prattville City Council who voted in favor of the rezoning ordinance.  BVCV contends that the rezoning ordinance is a takings under the Fifth and Fourteenth Amendments and violates substantive due process under the Fourteenth Amendment.

Before the court is Defendants' motion to dismiss (Doc. # 13), which has been fully briefed (Docs. # 14 & 15).  For the reasons discussed below, the motion is due to be granted in part and denied in part.

# I.  JURISDICTION AND VENUE

The court exercises subject matter jurisdiction pursuant to 28 U.S.C. § 1331 (federal question).  Personal jurisdiction and venue are not contested.

# II.  STANDARD OF REVIEW

Defendants' motion to dismiss implicates Rule 12(b)(1) and Rule 12(b)(6) of the Federal Rules of Civil Procedure.  A motion to dismiss under Rule 12(b)(1) challenges the court's subject matter jurisdiction.  *McElmurray v. Consol. Gov't of Augusta–Richmond Cnty.,* 501 F.3d 1244, 1251 (11th Cir. 2007).  On a Rule 12(b)(1) facial attack, the court evaluates whether the plaintiff "has sufficiently alleged a basis of subject matter jurisdiction" in the complaint and employs standards similar to those governing Rule 12(b)(6) review.  *Houston v. Marod Supermarkets, Inc.*, 733 F.3d 1323, 1335 (11th Cir. 2013).

When evaluating a motion to dismiss pursuant to Rule 12(b)(6), a court must take the facts alleged in the complaint as true and construe them in the light most favorable to the plaintiff.  *Resnick v. AvMed, Inc.*, 693 F.3d 1317, 1321–22 (11th Cir. 2012).  To survive Rule 12(b)(6) scrutiny, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678, (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "[F]acial plausibility" exists "when the plaintiff pleads factual content that allows the court to draw the reasonable inference

that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556).

Generally, under the Rule 12(b)(6) standard, review is limited to the face of the complaint, and consideration of matters outside the pleadings converts the motion to dismiss into a motion for summary judgment. *See* Fed. R. Civ. P. 12(d); *Day v. Taylor*, 400 F.3d 1272, 1275–76 (11th Cir. 2005). However, there are exceptions to this general rule. First, a district court can consider exhibits attached to the complaint under the Rule 12(b)(6) standard. *See* Fed. R. Civ. P. 10(c). Second, a district court can consider unattached documents if they are (1) central to the complaint and (2) no party questions their authenticity. *Day*, 400 F.3d at 1276. A document is central to a complaint when it is a "necessary part of [the plaintiff's] effort to make out a claim." *Id.*

## III.  BACKGROUND

The facts essential for resolving the motion to dismiss, construed in BVCV's favor, are as follows. In 2012, BVCV bought 38 acres of undeveloped property in the City of Prattville, Alabama ("City"). (Doc. # 1, ¶ 9 (Compl.).) The property is adjacent to a retail shopping mall called High Point Town Center and encompasses

three parcels identified as Lots A, B, and C.  (Doc. # 1, ¶ 9.)  Lot C is the largest parcel, consisting of 31.5 acres.[1]  (Doc. # 1, ¶¶ 9, 21.)

The BVCV property is part of the City's 2010 updated Prattville Comprehensive Plan.  The City's Future Land Use Plan and Map designated the BVCV property as mixed-use transitional.  (*See* Doc. # 1, ¶ 14; Doc. # 1-4, at 5.) Mixed-use transitional supports the development of "office, housing (of a variety of densities), hospitality . . . and greenspace" but discourages "additional retail that might soften the existing market."  (Doc. # 1-4, at 5.)  "Retail might be accommodated, but at a very limited scale, and of a purely local-serving variety." (Doc. # 1-4, at 5.)

The BVCV property underwent zoning changes both prior to and after BVCV's purchase.  In 2006, the property was rezoned from its classification of FAR (forest, agricultural, and recreation) to B-2 (general business).  (*See* Doc. # 1-4, at 3.) B-2 zoning permits development for "[a]ny retail or wholesale business or service not specifically restricted or prohibited[, including m]ajor auto repair; funeral homes; places of amusement and assembly; business recycling facilities, community recycling facilities[,] and community recycling receptacles; [and] any use permitted in a B-1 Local Shopping District."  (Doc. # 1, ¶ 12.)

---

[1] Although the Complaint discusses the zoning history of Lots A and B, the Complaint's claims challenge only the constitutionality of the rezoning of Lot C.

From 2006 to 2019, the BVCV property was zoned as B-2.[2]  (Doc. # 7-2, at 3-4, 7.)  In 2019, a property developer, on behalf of BVCV, requested the rezoning of Lot C to R-4, with the intention of developing Lot C with "180 units."  (Doc # 1-4, at 2–3; Doc # 7-2, at 1–3.)  If zoned as R-4, Lot C could be developed for use as "[d]wellings and apartments for any number of families."  (Doc. # 1, ¶ 11.)  In July 2019, the City approved the zoning request for Lot C.  It also packaged Lots A and B with Lot C for rezoning; hence, the City rezoned the whole BVCV property to R-4.  (*See* Doc. # 1, ¶ 11; Doc. # 1-4, at 3.)

A year and a half later, in December 2020, without consulting BVCV, the City unilaterally submitted an application to the City's Planning Commission requesting that the BVCV property be rezoned from R-4 back to B-2.  (Doc. # 1-3, at 2.)  "At or around the same time, BVCV was negotiating a contract for the sale of Lot C" to a multifamily residential developer.[3]  (Doc. # 1, ¶¶ 12, 21.)

In January 2021, the Planning Commission received a recommendation from the City's Planning Department Staff that Lots A and B be rezoned to B-2, "which

---

[2] Documents attached to Defendants' original motion to dismiss provide the ownership and zoning history of the BVCV property.  (Doc. # 7-2.)  The ownership and zoning history are referenced in the Complaint and are at the core of BVCV's claims.  Additionally, BVCV has not challenged the authenticity of Defendants' documents or urged their exclusion.  Therefore, consideration of these documents does not convert the motion to dismiss into one for summary judgment.  *See Day*, 400 F.3d at 1276.

[3] It appears that this developer is not the same developer who requested and obtained the rezoning of Lot C in 2019.  (*See* Doc. # 1, ¶ 16.)

[would] allow uses to support the retail corridor."  (Doc. # 1, ¶¶ 13–14; Doc. # 1-4, at 3–4.)  The Planning Department Staff also recommended that Lot C remain zoned as R-4 or be rezoned to O-1 or B-1.  (Doc. # 1, ¶ 14; Doc. # 1-4, at 3–4.)  The Planning Department Staff deemed the City's application for rezoning Lots A, B, and C to "be inconsistent with" the Prattville Comprehensive Plan.  (Doc. # 1, ¶ 14.)

Also in January 2021, the Planning Commission considered the City's request and heard from the mayor, who spoke in favor of the ordinance, and from BVCV, which opposed the rezoning.  (Doc. # 1, ¶ 16.)  The Planning Commission delayed voting on the City's rezoning application "so that it could review the matter further in committee" and obtain a legal opinion from the City's attorney "on its position of rezoning the property without the property owner's consent."  (Doc. # 1, ¶ 17.)  At its next meeting in February 2021, the Planning Commission voted to deny the City's application to rezone BVCV's property from R-4 to B-2.  (Doc. # 1, ¶ 18.)

In May 2021, the Prattville City Council held a public hearing to discuss multiple proposed ordinances, including the ordinance to rezone all three lots of BVCV's property from R-4 to B-2.  (Doc # 1-7, at 2.)  At the meeting, a representative from BVCV spoke out against the proposal, stating that BVCV was "in the process of a multi housing project" when the City submitted its rezoning request and that rezoning would "interfere[] with the project moving forward." (Doc. # 1–7, at 2.)  The same day, the City Council held a vote, and four of the seven

council members approved the proposed ordinance to rezone the property from R-4 to B-2.  (Doc. # 1-8, at 2; Doc. # 1-9, at 4.)  Council members John Chambers, Jerry Starnes, Blair Gornto, and Lora Lee Boone voted in favor of the ordinance.  (Doc. # 1-9, at 4.)  Gornto and Starnes stated that their constituents did not support additional multifamily dwellings in the district.  (Doc. # 1-9, at 7–8.)

The rezoning put an end to BVCV's negotiations with a prospective purchaser of Lot C for multifamily residential development.  BVCV alleges that the rezoning ordinance "caused BVCV to lose the sale of the Property and potentially millions of dollars in lost profits."  (Doc. # 1, ¶ 21.)  The loss of the sale to the prospective buyer, according to BVCV, was "not surprising" because the adjacent High Point Town Center property, which was developed for retail shopping in 2008, houses "mostly vacant" and unleased retail space.  (Doc. # 1, ¶ 21.)

BVCV then brought this action against the City and the four members of the Prattville City Council who voted in favor of the rezoning ordinance.  The council members are sued in their official capacities only.

The Complaint contains three counts.  BVCV brings two claims alleging that Defendants violated its rights protected by the Fifth and Fourteenth Amendments to the United States Constitution, as enforced by 42 U.S.C. § 1983.  The first claim alleges that the 2021 rezoning ordinance amounts to an unlawful taking of BVCV's property without just compensation, while the second claim alleges that the rezoning

ordinance was arbitrary and capricious in violation of substantive due process.  The Complaint also contains a separate count for a declaratory judgment that the rezoning ordinance is invalid under the United States Constitution and under Alabama law.

## IV.  DISCUSSION

The discussion is divided into three parts.  Part A discusses the individual Defendants' defense of absolute immunity.   Part B addresses the § 1983 constitutional claims.  Part C analyzes the independent declaratory judgment count.

**A.**     **The Individual Defendants' Defense of Absolute Legislative Immunity**

Before delving into the analysis of BVCV's claims, it is appropriate to address the individual Defendants' defense of absolute legislative immunity as to the official capacity claims brought against them under § 1983; however, for the reasons that follow, it is unnecessary to resolve whether the defense applies.

BVCV has sued four members of the City Council of Prattville in their official capacities only.   Defendants argue that these four Defendants have absolute legislative immunity and that therefore all monetary damages claims against the City Council members must be dismissed.  BVCV agrees that the individual Defendants "are immune from suit to the extent that BVCV seeks monetary relief from their actions in their official capacities as City Council members" but argues that, as to

prospective injunctive relief, the individual Defendants are not immune from suit. (Doc. # 14, at 11.)

In *Bogan v. Scott-Harris*, the United States Supreme Court held that "local legislators," like their state and regional counterparts, "are . . . absolutely immune from suit under § 1983 for their legislative activities." 523 U.S. 44, 49 (1998). However, as the Eleventh Circuit has recognized, "the Court's opinion [in *Bogan*] is not clear as to whether the local legislators were sued in their official or individual capacities." *Scott v. Taylor*, 405 F.3d 1251, 1256 n.6 (11th Cir. 2005). The Sixth Circuit has interpreted *Bogan* as permitting local legislators to "invoke legislative immunity to insulate themselves *as individuals* from liability based on their legislative activities. In other words, local legislators will not face personal liability for their legislative activities." *Smith v. Jefferson Cnty. Bd. of Sch. Comm'rs*, 641 F.3d 197, 218 (6th Cir. 2011) (emphasis in original) (internal citations omitted). The Sixth Circuit's view is in accord with the Second Circuit's. *See State Empls. Bargaining Agent Coal. v. Rowland*, 494 F.3d 71, 86 (2d Cir. 2007) ("[L]egislative immunity is available to local officials who are sued in their individual capacities."); *see also Bd. of Cnty. Comm'rs v. Umbehr*, 518 U.S. 668, 677 n.* (1996) (noting in dicta that legislative immunity "extends to public servants only in their individual capacities" and that "the legislative immunity claim is moot" because "only claims

9

against the [local] Board members in their official capacities" were before the Court).

Here, individual capacity liability is not in play. Neither party's arguments address whether a distinction lies between official capacity and individual capacity suits for local officials who raise legislative immunity as a defense. This case does not require the court to opine on the distinction, if any, because BVCV also has sued the City under § 1983. Municipalities are "persons" within the scope of § 1983 and thus can be sued directly. *Monell v. Dep't of Soc. Servs. of New York*, 436 U.S. 658, 690 (1978). Hence, it is settled law that § 1983 "suits against a municipal officer sued in his official capacity and direct suits against municipalities are functionally equivalent" and that it is redundant "to bring official-capacity actions against local government officials . . . ." *Busby v. City of Orlando*, 931 F.2d 764, 776 (11th Cir. 1991). Because under § 1983 the suit against the individual Defendants in their official capacities is redundant of the suit against the City, the official capacity claims against the individual Defendants will be dismissed. *See id.* Henceforth, the discussion refers only to the City as Defendant.

## B.  § 1983 Constitutional Claims (Counts 2 and 3)

To hold a municipality liable on a § 1983 claim, "a plaintiff must show: (1) that his constitutional rights were violated; (2) that the municipality had a custom or policy that constituted deliberate indifference to that constitutional right; and

(3) that the policy or custom caused the violation." *McDowell v. Brown*, 392 F.3d 1283, 1289 (11th Cir. 2004).  The City's arguments focus only on the first element (Doc. # 13, at 12–13); the court does likewise.

### 1. *Fifth Amendment Takings Claim*

The Fifth Amendment's Takings Clause, applicable to the states through the Fourteenth Amendment, provides that private property cannot "be taken for public use, without just compensation."  U.S. Const. amend. V.  A takings claim has two components.  *See Givens v. Ala. Dep't of Corrs.*, 381 F.3d 1064, 1066 (11th Cir. 2004).  First, the plaintiff must "demonstrate that he possesses a 'property interest' that is constitutionally protected."  *Id.*  Second, where a property interest exists, the court must decide "whether the deprivation or reduction of that interest constitutes a 'taking.'"  *Id.*

### a. **BVCV's Property Interest**

BVCV contends that it has a constitutionally protected property interest in the R-2 residentially zoned property.  Property interests "are not created by the constitution.  Rather they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law— rules or understandings that secure certain benefits and that support claims of entitlement to those benefits."  *Reserve, Ltd. v. Town of Longboat Key*, 17 F.3d 1374, 1379 (11th Cir. 1994) (quoting *Bd. of Regents v. Roth*, 408 U.S. 564, 577 (1972));

*see also DeKalb Stone, Inc. v. Cnty. of DeKalb*, 106 F.3d 956, 959 (11th Cir. 1997) ("It is well established that land use rights, as property rights generally, are state-created rights.").

Alabama law speaks in terms of a property owner's "vested rights."  *See Grayson v. City of Birmingham*, 173 So. 2d 67, 69 (Ala. 1963) (per curiam); *see generally Restigouche, Inc. v. Town of Jupiter*, 59 F.3d 1208, 1211 n.1 (11th Cir. 1995) (equating "vested rights" under state law with "protected property interests" when analyzing whether a zoning regulation amounted to an unconstitutional taking).  In *Grayson*, the Alabama Supreme Court set out the test for evaluating a vested rights claim in the context of a zoning regulation.  In that case, the Jefferson County Planning and Zoning Commission approved a company's request to rezone agricultural property to residential and commercial parcels.  Thereafter, the company made substantial improvements to the parcels to adapt them for commercial use. Those improvements included paving streets, adding water pipes and storm sewers, and leveling and clearing lots.  *Grayson*, 173 So. 2d at 68.  Less than a year after these improvements were made, the City of Birmingham annexed the property into the city and rezoned the company's property back to residential.  The company sued the city challenging the rezoning of the property.  *See id.* at 68–69.  It argued that the improvements it had made gave it vested rights in the property that could not be taken away by the zoning change.  *See id.* at 69.

The Alabama Supreme Court held that "[a]ny amendment to a zoning ordinance . . . must stand or fall on vested rights, which, in the absence of a contract, depend for their existence on equitable fairness, both to the property owner and to the general public." *Id.*  The court explained that "changes, investments, and permits, relating as they do to structures initiated or completed [on the rezoned property], are made the criteria of hardships imposed on the property owner and judicially recognized to sustain the claims of vested rights" but that "[t]he facts in no two cases are the same." *Id.*

Even though in *Grayson* the landowner had made physical improvements to the land in reliance on the then-current zoning ordinance, those improvements were not enough to give the company vested rights.  The public's interests in the rezoning law also had to be weighed.  *Id.* at 70.  As for the public's interest, the rezoning law was designed to reduce traffic congestion near a planned school and "to protect pedestrians and motorists in this area from loss of life or serious injury." *Id.* at 71–72.  In *Grayson*, the public's interests trumped the property owner's loss of investment in preparing for commercial development; hence, the property owner "did not acquire a vested right to the lots in question so as to make them immune from the zoning ordinance here under attack." *Id.* at 72; *see also Breland v. City of Fairhope*, 337 So. 3d 741, 750 (Ala. 2020) (discussing *Grayson*'s "framework for evaluating a vested-rights claim"), *reh'g denied* (Apr. 23, 2021).

13

Based on *Grayson*'s pronouncements, if BVCV acquired vested rights in the property when zoned as R-2, then it has a property interest deserving protection under the Fifth and Fourteenth Amendments, and the ordinance rezoning the property to B-2 cannot cut off those vested rights. While the City might ultimately prevail under *Grayson*, the weighing of the relevant interests is not appropriate on this Rule 12(b)(6) record.

To begin, under *Grayson*, the fact that the BVCV property has remained undeveloped since BVCV purchased it weighs in the City's favor. (*See, e.g.*, Doc. # 1, ¶ 9 (describing the BVCV property as "undeveloped"); Doc. # 1-3, at 2 (zoning application describing the property as "undeveloped").) There are no allegations that BVCV has made any physical improvements to the property or has obtained any permits, and there is no demand for damages in the Complaint for the recovery of any investments made in developing the property. Notwithstanding that this fact favors the City, other considerations mandate the denial of the Rule 12(b)(6) motion.

First, the Alabama Supreme Court has recognized that "physical improvement to property may not be required to establish a vested right in every instance," depending on how the equities play out. *Breland*, 337 So. 3d at 751. The equities require a balancing between the landowner's interests and the public's interests. *See Grayson*, 173 So. 2d at 69. At this juncture, the balancing of equitable fairness to BVCV and to the public is a substantial evidentiary question not suited for resolution

14

on the allegations or the arguments.  First, as to the allegations, there is little yet to weigh on the side of equitable fairness to the public.  As for the public's interests, the zoning regulation must "bear some substantial relation to the public health, safety, morals, or general welfare, or, as otherwise expressed, the public convenience or the general propensity."  *Id.* at 71.  As reflected in the minutes of the May 18, 2021 Prattville City Council meeting, two council members expressed the sentiments of their constituents that they did not want additional multifamily housing in the district.  (Doc. # 1-9, at 7–8.)  But the minutes do not indicate the reasons for those concerns and whether those concerns are directed toward the health and general welfare of the public.  In *Grayson*, the issues were decided on a full evidentiary record, not on the allegations.  *See Grayson*, 173 So. 2d at 68, 71.  The City has not pointed to allegations that weight the public interests decidedly in the City's favor.  That weighing here is best left for the evidence, after discovery, because, at bottom, "[t]he facts in no two cases are the same."  *Id.* at 69.

Second, the City's arguments addressing the requirement of a constitutional property interest are not developed.  The arguments do not rely on Alabama law.  (*See* Doc. # 13, at 14 (citing Sixth Circuit decisions); Doc. # 13, at 14 (citing no authority for its argument that BVCV's successful petition in 2019 to rezone the property to R-4 "does not entitle [BVCV] to any 'vested rights' in a particular use" of the property).)  Also, the City does not devote much discussion to whether BVCV

15

had acquired vested rights in the R-2 zoning of its property.  (*See* Doc. # 13, at 15 ("*Without questioning whether Plaintiff has acquired vested rights in such a property interest*, a denial of permission to build a particular development project does not by itself state a just compensation claim." (citation and quotation marks omitted).)  No criticism is directed to the City's dearth of argument because, as discussed, the required balancing of equitable fairness to assess "vested rights is a fact-intensive inquiry," better suited for the evidence.  *Breland*, 337 So. 3d at 750 (citing *Grayson*, 173 So. 2d at 69).  The undeveloped arguments reveal why the balancing should await discovery and the evidence.

### b.      Deprivation of the Property Interest

The City focuses its arguments on the second element of a takings claim, contending that the facts do not show a deprivation of a property interest sufficient to amount to a Fifth Amendment taking.

The classic taking occurs when the government exercises its power of eminent domain to gain possession of private property for public use.  *See Lingle v. Chevron U.S.A., Inc.*, 544 U.S. 528, 537 (2005).  Here, BVCV has not alleged a classic taking. BVCV has alleged a regulatory taking, which occurs when governmental regulation of private property is "so onerous that its effect is tantamount to a direct appropriation or ouster."  *Id.*  The issue is whether BVCV has plausibly alleged that a taking has taken place because the rezoning ordinance "goes too far."  *Id.* ("[W]hile

16

property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking." (citation and internal quotation marks omitted)).

The analysis for determining whether the rezoning ordinance went too far is governed by the Supreme Court's test in *Penn Central Transportation Co. v. City of New York*. *See* 438 U.S. 104 (1978); *see also Cedar Point Nursery v. Hassid*, 141 S. Ct. 2063, 2072 (2021) ("To determine whether a use restriction [such as a zoning ordinance] effects a taking, this Court has generally applied the flexible test developed in *Penn Central* . . . ." (alterations added)).  In *Penn Central*, the Supreme Court set forth three, non-exhaustive factors, for courts to consider when determining whether a regulatory taking has occurred.  438 U.S. at 124–25.  These factors are (1) the economic impact of the regulation on the landowner, (2) the extent to which the regulation interfered with the landowner's reasonable investment-backed expectations, and (3) the character of the governmental action.  *Id.*  The *Penn Central* inquiry "aims to identify regulatory actions that are functionally equivalent to the classic taking in which government directly appropriates private property or ousts the owner from his domain."  *Id.*  Recently, in *Murr v. Wisconsin*, the Supreme Court recognized the competing objectives that *Penn Central*'s factors accommodate:  On the one hand, a property owner has a "right to retain the interests and exercise the freedoms at the core of private property ownership."  137 S. Ct. 1933, 1943 (2017).  On the other hand, most government regulation does not

effectuate a taking given the "government's well-established power to adjust rights for the public good." *Id.* (cleaned up) (citing *Andrus v. Allard*, 444 U.S. 51, 65 (1979)).

The court begins with two preliminary observations.  First, the procedural posture on a Rule 12(b)(6) motion is to the City's disadvantage.  The regulatory takings jurisprudence invokes "essentially ad hoc, factual inquiries," *Penn Cent.*, 438 U.S. at 124, which are designed to allow "careful examination and weighing of all the relevant circumstances." *Palazzolo v. Rhode Island*, 533 U.S. 606, 636 (2001) (O'Conner, J., concurring).  While dismissal of a complaint for a regulatory taking under Rule 12(b)(6) is not in all cases inappropriate, a dismissal should be viewed with a measure of skepticism to ensure that the property owner is not prematurely denied an opportunity to present evidence.

Second, some of the City's arguments focus on a type of takings claim that BVCV now has confirmed is not at issue.  The City argues that BVCV's claim fails as a matter of law because the allegations do not show that BVCV "was deprived of all economic benefit by rezoning it to B-2."  (Doc. # 13, at 16.)  BVCV's argument would be germane as to a "*per se* takings for Fifth Amendment purposes." *Lingle*, 544 U.S. at 538 (explaining that a *per se* takings occurs where governmental regulations "completely deprive an owner of all economically beneficial use of her property" (cleaned up)).  Regulatory takings that fall short of "*per se* takings" do not

require zoning ordinances to eliminate completely all of a property's value. *Id.* at 539. "Anything less than a complete elimination of value, or a total loss, . . . requires the kind of analysis applied in *Penn Central*." *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Plan Agency*, 535 U.S. 302, 330 (2002) (cleaned up). The Eleventh Circuit decision upon which the City relies predates the Supreme Court's decision in *Lingle* (*see* Doc. # 13, at 15) and *Lingle* makes clear that a regulatory takings claim can go forward without allegations that the governmental regulation rendered the affected property valueless. Here, BVCV admits that the 2021 rezoning ordinance did not deprive it of "all economically beneficial use" of the relevant property and thus that there was not a "per se takings for Fifth Amendment purposes." *Lingle*, 544 U.S. at. at 538 (cleaned up); (*see* Doc. # 14, at 7.) With that clarification, the court turns to the *Penn Central* factors.

### i.    Economic Impact

The first *Penn Central* inquiry focuses on "the magnitude of a regulation's economic impact." *Lingle*, 544 U.S. at 540. *Penn Central* did not identify any rules as to how to measure the economic impact of a regulation. Later, in *Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470 (1987), the Court pronounced that the "test for regulatory taking requires" a court "to compare the value that has been taken from the property with the value that remains in the property." *Id.* at 497. The Court reiterated that these values must focus on the "'*parcel as a whole*.'" *Id.*

(quoting *Penn Cent.*, 438 U.S. at 130–31).  "[W]here an owner possesses a full bundle of property rights, the destruction of one strand of the bundle is not a taking because the aggregate must be viewed in its entirety." *Id.* (quoting *Andrus*, 444 U.S. at 65–66).  Hence, not every reduction in the value of property will amount to a taking. *See Dirt, Inc. v. Mobile Cnty. Comm'n*, 739 F.2d 1562, 1566 (11th Cir. 1984) ("A reduction in value alone will not constitute a taking.").  A deprivation of the "'most beneficial use of the property'" is not sufficient to establish a taking. *Quinn v. Bd. of Cnty. Comm'rs for Queen Anne's Cnty.*, 862 F.3d 433, 442 (4th Cir. 2017) (quoting *Penn Cent.*, 438 U.S. at 125)).  Nor is a "severe decrease in the value of property" necessarily a taking. *Nasser v. City of Homewood*, 671 F.2d 432, 438 (11th Cir. 1982).

Construed in BVCV's favor, the Complaint's allegations, as reinforced by BVCV's arguments, rely on two independent measurements for assessing the economic impact of the 2021 rezoning ordinance on its property.  First, the Complaint alleges that the change in zoning from R-4 to B-2 caused it to lose "potentially millions of dollars" in profits when it was unable to "finaliz[e] a contract with a developer for the sale of the Property" for multifamily residential housing. (Doc. # 1, ¶ 21.)  Second, the Complaint alleges that the property's "economically viable or beneficial use [was] substantially diminished by the City's decision to change its zoning classification from R-4 to B-2."  (Doc. # 1, ¶¶ 21, 26.)  The

Complaint's averment—that the adjacent High Point Town Center is "mostly vacant with approximately 100,000 square feet of retail space remaining unleased" (Doc. # 1, ¶ 22)—implies that the B-2 zoning depresses the economic value of BVCV's property if used for retail establishments.

The City's argument that BVCV's allegations of lost profits from a potential sale of the property are insufficient for measuring the reduction in the property's value has support.  As explained by the Federal Circuit, "the vast majority of takings jurisprudence examines, under *Penn Central*'s economic impact prong, not lost profits but the lost value of the taken property." *Rose Acre Farms, Inc. v. United States*, 559 F.3d 1260, 1268 (Fed. Cir. 2009).   The court also observed that, "[w]hen the Supreme Court has assessed the economic impact of a regulatory taking, it has talked almost exclusively in terms of lost value rather than lost profits." *Id.* at 1268–69 (collecting cases).  The *Rose Acre Farms* court reasoned that the lost-profits approach "does not provide a sufficiently accurate view" of economic impact and "does not set any baseline or standard to which to compare an inherently relative number." *Id.* at 1269 (holding that the district court's reliance on lost profits "as indicative of a severe economic impact" was faulty).

BVCV does not attempt to compare the potentially lost profits "to anything, such as some benchmark standard." *Id.*  Further problematic is that there are no allegations that, absent the 2021 rezoning ordinance, BVCV would have sealed the

deal with a signed contract for the sale of Lot C.  The anticipated sale still was in the negotiations phase, even if it was, as alleged, in the final phases.  (Doc. # 1, ¶ 21.) Thus, whether there were any profits to be lost is unknown on the allegations.  While the foregoing weaknesses in the Complaint's reliance on an economic impact theory predicated on lost profits are noted, this opinion should not be read to preclude discovery of and reliance upon a loss profits theory.  The court's finding is only that, at this stage of the proceedings, the first *Penn Central* factor weighs in the City's favor to the extent that BVCV relies on a lost profits theory.  This does not end the inquiry into the economic impact factor.

The Complaint also includes allegations of lost value.  The City rezoned BVCV's property to B-2 commercial zoning.  B-2 commercial zoning supports "retail or wholesale business" and services.  (Doc. # 1, ¶ 12.)  BVCV contends that rezoning to accomplish more retail development devalues its property because the adjacent High Point Town Center is "mostly vacant with approximately 100,000 square feet of retail space remaining unleased." (Doc. # 1, ¶ 22.)   In BVCV's favor, it is logical to infer that constructing more buildings for retail purposes on Lot C would add only to the square-footage vacancy and not to BVCV's coffers.  But for two reasons, the allegations still are deficient to tilt the economic impact factor in BVCV's favor.

First, retail shops are not the only types of businesses that are permitted for property zoned as B-2 so BVCV's emphasis here is incomplete.  (*See* Doc. # 1, ¶ 12.) The B-2 "general business" zoning classification, as the City emphasizes, allows the property to be developed for other purposes, including motels, hotels, filling stations, places of amusement, major auto repair, recycling facilities, and offices.  (*See* Doc. # 1, ¶ 12; Doc. # 1-4, at 3.)  BVCV has alleged that the rezoning ordinance denies its ability to use the property in one way, namely, for multifamily housing.  It has not alleged that it has been denied these other uses of the property.  The absence of such allegations does not align with settled precedent that a land-use regulation can "prohibit the most beneficial use of the property" and yet still not rise to the level of a taking.[4]  *Penn Cent.*, 438 U.S. at 125.

Second, the Complaint's allegation that the rezoning ordinance caused "a substantial diminution in [the] value" of BVCV's property is not an arithmetic allegation of the property's alleged diminished value.  At summary judgment, BVCV will face a high bar for establishing a compensable economic impact for a takings claim.  In *Nasser*, for example, the Eleventh Circuit held that a 53 percent

---

[4] BVCV maintains that the loss of the sale for the development of the property as a multifamily housing complex is sufficient to carry the claim past the motion to dismiss.  (Doc. # 14, at 8.)  BVCV relies on *Young Apartments, Inc. v. Town of Jupiter, Fla.*, for its argument that a plausible claim of economic impact has been alleged here.  529 F.3d 1027 (11th Cir. 2008).  But *Young Apartments* analyzed an equal protection claim, not a takings claim.  *Id.* at 1037.  The discussion of economic damages was for the purpose of establishing the *Young Apartments* plaintiff's standing.  *Id.* at 1042.  *Young Apartments* does not help BVCV's position.

reduction in the fair market value of property (from $285,000 to $135,000) caused by a zoning change from multifamily residential to single-family residential did not "measure[] up to an unlawful taking."  671 F.2d at 438.  Other circuit decisions also demonstrate the high bar for establishing a taking based on a diminution in property value caused by a governmental regulation.  In *Clayland Farm Enterprises, LLC v. Talbot County, Maryland*, a zoning ordinance's negative impact on a property's value, decreasing the value 40 percent from $3,250,000 to $1,950,000, was not a taking.  987 F.3d 346, 354–55 (4th Cir. 2021).  The Fourth Circuit further observed that "other circuits have found no regulatory taking when presented with diminutions in value of 75 percent and 92.5 percent."  *Id.* at 354 (citing cases from the Sixth and Eighth Circuits).  And the Federal Circuit has opined that it is "aware of no case in which a court has found a taking where diminution of value was less than 50 percent."  *CCA Assocs. v. United States*, 667 F.3d 1239, 1246 (Fed. Cir. 2011) (internal quotation marks omitted).  Here, BVCV has not alleged any specific diminution of value or even a ballpark estimate, much less that the diminution exceeds 50%.

In sum, the Complaint's allegations weigh in favor of the City on the first *Penn Central* factor.

24

ii.   **Interference with BVCV's Reasonable Investment-Backed Expectations**

The second *Penn Central* factor focuses on the degree that the regulation interferes with reasonable and distinct investment-backed expectations. *Penn Cent.*, 438 U.S. at 124.  The City argues that BVCV's expectations to sell the property to a residential developer were not reasonable because BVCV "bought the property when it was zoned B-2—and permissibly encumbered by all zoning restrictions."  (Doc. # 13, at 14; Doc. # 15, at 1–2.)

The City is correct that "the regulatory regime in place at the time the claimant acquires the property at issue helps to shape the reasonableness of those [investment-backed] expectations." *Palazzolo*, 533 U.S. at 633 (O'Connor, J., concurring). BVCV purchased the property in 2012 when it was zoned B-2 for general business. *Palazzolo* supports the City's argument that it would not have been reasonable for BVCV to have expected that, at the time of purchase, it could have developed the property for multifamily residential units.  That development prospect would have required R-4 zoning.

But, as Justice O'Connor explained, "the state of regulatory affairs at the time of acquisition is not the only factor that may determine the extent of investment-backed expectations. . . . Courts instead must attend to those circumstances which are probative of what fairness requires in a given case." *Id.* at 634–35 (O'Connor,

J., concurring).  The Complaint alleges that in 2019 the property was rezoned to R-4, which permits residential development, and it was during that time frame that BVCV was negotiating with a prospective buyer.  BVCV alleges that it reasonably relied on the R-4 zoning for Lot C when it engaged in negotiations with the prospective buyer who wanted to develop a multifamily residential facility on the property.  (Doc. # 1, ¶¶ 12, 21.)  The zoning ordinance in effect at the time of these negotiations render plausible the allegations that BVCV had a reasonable investment-backed expectation that it could sell the property to a third party for residential development.  Furthermore, the allegations plausibly show that the 2021 rezoning ordinance interfered with this reasonable investment-backed expectation: The ordinance put an end to BVCV's negotiations for Lot C's purchase by a third-party developer.

The Complaint plausibly explains how the 2021 rezoning ordinance has interfered with BVCV's reasonable investment-backed expectations.  On the pleadings and arguments, the allegations weigh in favor of BVCV on the second *Penn Central* factor.

### iii.    The Character of the Governmental Action

Concerning the third *Penn Central* factor—which focuses on the "character of the governmental action," *Penn Cent.*, 438 U.S. at 124—the City compares the 2021 rezoning ordinance, which it says was validly enacted after public notice and

26

a hearing, to a permissible public program to control municipal development based on density.  (Doc. # 13, at 14.)  BVCV counters that the character of the 2021 rezoning ordinance weighs in its favor because the City unfairly "singled out" its property for rezoning, over BVCV's objection, "in an economically devastating way."  (Doc. # 14, at 9.)  For the following reasons, the character of the City's action in enacting the 2021 rezoning ordinance weighs in favor of BVCV on the allegations.

"[F]or just compensation claims, the character of the government action is another way to examine the severity of the government interference with property rights."  *S. Grande View Dev. Co. v. City of Alabaster*, 1 F.4th 1299, 1311 (11th Cir. 2021) (internal quotation marks omitted).  The Supreme Court instructs that "[a] 'taking' may more readily be found when the interference with property can be characterized as a physical invasion by government, than when interference arises from some public program adjusting the benefits and burdens of economic life to promote the common good."[5]  *Penn Cent.*, 438 U.S. at 124 (internal citation omitted).  "Zoning laws are, of course, the classic example" of "permissible

---

[5] An example of a physical invasion, which is not at issue here, is *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419 (1982), where New York City authorized Teleprompter Manhattan CATV Corporation to place thirty-six feet of coaxial cable and two switchboxes on the property of Loretto.  Notwithstanding the minimal burden placed on the property owner, the *Loretto* Court held that a taking had occurred.  "[W]hen the character of the governmental action is a permanent physical occupation of property, our cases uniformly have found a taking to the extent of the occupation, without regard to whether the action achieves an important public benefit or has only minimal economic impact on the owner."  *Loretto*, 458 U.S. at 434–35 (internal citation and quotation marks omitted).

governmental action even when prohibiting the most beneficial use of the property." *Id.* at 125.

Finally, when analyzing the character of the governmental action, courts should not inquire into "the rationale behind the regulation." *S. Grande View Dev. Co.*, 1 F.4th at 1311–12 ("*Lingle* changed the type of inquiry permitted in a just compensation claim, and abrogated our earlier precedent permitting an inquiry into the rationale behind the regulation.") (citing *Lingle*, 544 U.S. at 539 and *Rose Acre Farms, Inc.*, 559 F.3d at 1278); *see also Rose Acre Farms, Inc.*, 559 F.3d at 1278 ("[U]nder *Lingle*, the regulatory takings paradigm has changed.  We can no longer ask whether the means chosen by government advance the ends or whether the regulation chosen is effective in curing the alleged ill.  All those concerns, albeit relevant concerns in many cases dealing with governmental regulations, are now confined to a substantive due process inquiry.").

Against the backdrop of the foregoing principles, the 2021 rezoning ordinance is not a physical invasion of the property, *Penn Cent.*, 438 U.S. at 124, but rather is a land use regulation.  While the invasion-versus-regulation distinction leans in the City's favor, overall, the Complaint's allegations tilt this factor in BVCV's favor.

First, as alleged, the 2021 rezoning ordinance affected only BVCV's property. (*See* Doc. # 1-3 (The City's application for rezoning); *see also* Doc. # 1, at 6–7.) This fact distinguishes BVCV's action from the facts in *Penn Central*.  In *Penn*

28

*Central*, New York City's zoning ordinance did not single out the plaintiff. The ordinance applied to "31 historic districts and over 400 individual landmarks" and placed restrictions on all owners' use of the protected historical properties. *Penn Cent.*, 438 U.S. at 111; *see also Bridge Aina Le'a, LLC v. Hawaii Land Use Comm'n*, No. 11-00414, 2018 WL 11348072, at *2 (D. Haw. Feb. 2, 2018) ("[E]vidence of the 'character of the governmental action' under *Penn Central* . . . include[s] evidence that Plaintiff was singled out or treated unusually.").

Second, the Complaint alleges that the 2021 rezoning ordinance runs counter to the Future Land Use Plan of the Prattville Comprehensive Plan. (Doc. # 1, at 4–5.) As set out in an exhibit attached to the Complaint, the Future Land Use Plan designates BVCV's property as "mixed-use transitional," and mixed-use transitional supports the development of "housing (of a variety of densities)" and discourages "additional retail that might soften the existing market." (Doc. # 1-4, at 5.) Rezoning BVCV's property from R-4 to B-2, on its face, is inconsistent with the property's designation of mixed-use transitional. The allegation—that "the purported adopting of the Rezoning ordinance was done in contravention of the City's comprehensive plan" (Doc. # 1, at 7)—must be taken as true at this stage. These allegations prevent the conclusion that the zoning ordinance arose "from some public program adjusting the benefits and burdens of economic life to promote the common good." *Penn Cent.*, 438 U.S. at 124. Rather, the allegations plausibly allege that the City singled

out BVCV's property and prevented its owner from pursuing residential development.

### iv.    Summary of the *Penn Central* Factors

The *Penn Central* three-factor test, which applies to claims of regulatory takings, is an "*ad hoc* factual inquiry, designed to allow careful examination and weighing of all the relevant circumstances." *Tahoe-Sierra Pres. Council, Inc.*, 535 U.S. at 322.  On the allegations, the first *Penn Central* weighs in favor of the City, while the second and third factors weigh in favor of BVCV.

At the pleading stage, it is sometimes difficult to draw the line where *Twombly*'s requirement of plausible factual allegations ends and where an impermissible demand for evidence to support those allegations begins.  Based upon careful consideration of the totality of the allegations pertaining to the *Penn Central* factors, there is enough in the Complaint's allegations on the takings claim, taken as true, to pass muster under Rule 12(b)(6) review and to cross the threshold of possible to plausible.  *See Twombly*, 550 U.S. at 557.  No opinion is expressed on the ultimate merits of this case.  The parties are not precluded from conducting discovery on all three *Penn Central* factors, and they are free to reargue the *Penn Central* factors at summary judgment, in light of the evidence developed during discovery.  This opinion holds only that dismissal at the Rule 12(b)(6) stage is not appropriate.

2. *Substantive Due Process Claim*

A zoning decision violates substantive due process if it deprives the property owner of a constitutionally protected property interest and if the deprivation "is undertaken 'for an improper motive and by means that were pretextual, arbitrary and capricious, and . . . without any rational basis.'" *Greenbriar, Ltd. v. City of Alabaster*, 881 F.2d 1570, 1577 (11th Cir. 1989) (quoting *Spence v. Zimmerman*, 873 F.2d 256, 258 (11th Cir. 1989)).

### a.   BVCV's Property Interest

Like a takings claim, a substantive due process claim requires that the landowner have a cognizable property interest under state law.  BVCV's arguments addressing the property interest element were addressed in the discussion of the takings claim.  This element does not resolve in the City's favor on the allegations.

### b.   Arbitrary and Capricious Governmental Action

Zoning regulations do not violate substantive due process unless they are enacted "for an improper motive and by means that were pretextual, arbitrary and capricious, and . . . without any rational basis." *Greenbriar, Ltd.*, 881 F.2d at 1577; *see also New Port Largo, Inc. v. Monroe Cnty.*, 95 F.3d 1084, 1091 (11th Cir. 1996) ("To prove a due process violation, [a plaintiff] must show that the re-zoning was 'clearly arbitrary and unreasonable, having no substantial relation to the public health, safety, morals, or general welfare.").  The relevant inquiry is whether the

31

City's "action bore no substantial relation to the general welfare," or in other words, whether there was a rational basis for the rezoning of the property at issue. *Greenbriar Ltd.*, 881 F.2d at 1577.  The Eleventh Circuit has recognized that because a city council is held democratically accountable by its constituents, the preferences of its constituents can provide a rational basis for a city's decision whether to rezone a particular property.  *See id.* at 1577–81.

The City argues that BVCV's Complaint establishes that the Council based its decision to rezone the property based on its constituents' concerns about housing density.  (Doc. # 13, at 20 (citing Doc. # 1-9, at 7–8).)  They cite the minutes of the May 18, 2021 Prattville City Council meeting, where Council members Gornto and Starnes stated that they cast their vote based on input they had received from their constituents.  As reflected in the minutes of that meeting, Council member Gornto said:  "He has not heard one person, in his district, say that they [sic] support any multifamily dwellings in his district."  (Doc. # 1-9, at 7.)  Council member Starnes said that "the public stated that they [sic] do not want any more apartments at this time."  (Doc. # 1-9, at 7.)

Ultimately, citizen input on the proposed zoning ordinance might prevail, but it cannot at this juncture.  There is no information in the minutes from which to discern the reasons for the constituents' concerns.  "[T]here could be circumstances in which a city's residents wanted a development blocked for illegitimate reasons,

such as racial prejudice." *Corn v. City of Lauderdale Lakes*, 997 F.2d 1369, 1387 (11th Cir. 1993). The City's reliance on the council members' recognition of their constituents' interests does not supply as of yet the rational basis required. The City does not point to anything else in the Rule 12(b)(6) documentation that recites a rational basis, and the court's independent review found none. For example, the rezoning ordinance itself does not include any reason for its enactment. *Cf. Image Media Advert., Inc. v. City of Chicago*, No. 17 C 4513, 2017 WL 6059921, at *7 (N.D. Ill. Dec. 7, 2017) ("Dismissal is appropriate here, as the Amendment itself sets forth in its preamble an eminently rational justification for its passage . . . ."). The City also does not argue other conceivable reasons for the zoning change, and the court declines at this stage to make that inquiry on the undeveloped arguments.

The court acknowledges that BVCV has a tough row to hoe to prevail on the substantive due process claim. *See Bd. of Trs. of Univ. of Ala. v. Garrett*, 531 U.S. 356, 367 (2001) ("[T]he burden is upon the challenging party to negative any reasonably conceivable state of facts that could provide a rational basis for the classification." (internal citations omitted)). But on the present arguments, the claim goes forward on the allegations. As BVCV points out, the allegations show that the City's 2021 rezoning ordinance inexplicably targeted only BVCV's property, that the rezoning ordinance is inconsistent with the Prattville Comprehensive Plan, and that the council members "failed to offer any legitimate ground for rezoning the

33

Property." (Doc. # 1-8, at 2; Doc. # 1, ¶¶ 20, 24, 27, 44.)  The allegations are enough to establish a plausible basis for finding that the 2021 rezoning ordinance lacks a rational basis.  The City's motion to dismiss BVCV's substantive due process claim will be denied.

## C.   **BVCV's Request for a Declaratory Judgment (Count 1)**

The remaining issue is BVCV's sought after declaratory relief  brought under the Declaratory Judgment Act, 28 U.S.C. § 2201.  In a separate count, BVCV seeks a declaration that (1) the City acted arbitrarily and capriciously in adopting the 2021 rezoning ordinance; (2) the 2021 rezoning ordinance "is void and invalid under Alabama law" and is "contrary to the Constitution of the United States"; and (3) the 2021 rezoning ordinance "constitutes an unauthorized and unwarranted exercise of power" that is unconstitutional as applied to BVCV's property and deprives BVCV of its property without due process of law.  (Doc. # 1, ¶ 32.)

The City moves to dismiss Count 1 on grounds that it does not carry an independent basis for subject matter jurisdiction.  (Doc. # 13, at 6–12.)  BVCV counters that supplemental jurisdiction over Count 1 exists because the "Declaratory Judgment claim arises out of the same facts and circumstances as its Fifth and Fourteenth Amendment claims" in Counts 2 and 3.  (Doc. # 14, at 5.)

The Declaratory Judgment Act provides that, "[i]n a case of actual controversy within its jurisdiction, . . . any court of the United States, upon the filing of an

appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201. A declaratory judgment is an equitable remedy; it is not a stand-alone cause of action. *See Aetna Life Ins. Co. of Hartford v. Haworth*, 300 U.S. 227, 240 (1937) (instructing that the "operation of the Declaratory Judgment Act is procedural only"). A plaintiff must prevail on an underlying claim to be entitled to a declaratory judgment. *See Okpalobi v. Foster*, 244 F.3d 405, 423 n.31 (5th Cir. 2001) ("[T]he law makes clear that—although the Declaratory Judgment Act provides a *remedy* different from an injunction—it does not provide an additional cause of action with respect to the underlying claim."); *In re Joint E. & S. Dist. Asbestos Litig.*, 14 F.3d 726, 731 (2d Cir. 1993) ("The Declaratory Judgment Act does not expand jurisdiction. Nor does it provide an independent cause of action. Its operation is procedural only—to provide a form of relief previously unavailable." (internal citation omitted)). Based on the foregoing authority, whether BVCV can obtain a declaratory judgment depends on the assertion of a viable underlying cause of action.

Because BVCV's § 1983 claims survive, there is an independent cause of action that supports BVCV's request for relief in the form of a declaratory judgment. It is therefore inappropriate to dismiss BVCV's requested declaratory relief on Counts 2 and 3.

However, another of BVCV's arguments—that supplemental jurisdiction exists over Count 1—is misplaced. Count 1 does not embody the required "claim." *See* 28 U.S.C. § 1367(a) ("[I]n any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other *claims* that are so related to the claims in the action within such original jurisdiction . . . ." (emphasis added)). The vague reference in Count 1 that the 2021 rezoning ordinance is invalid "under Alabama law" is not enough to allege a plausible state law claim as the basis for a declaratory judgment. Those three words—"under Alabama law"—do not provide "fair notice of what the claim is and the grounds upon which it rests." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 319 (2007) (citation omitted); *see* Fed. R. Civ. P. 8(a). Additionally, BVCV has not argued that its Complaint contains an independent state law claim. For these reasons, Defendants' motion to dismiss Count 1 will be granted to the extent BVCV seeks a declaratory judgment as to a state-law claim, but otherwise will be denied.

## V. CONCLUSION

BVCV's action goes forward on its Fifth/Fourteenth Amendment takings claim and its Fourteenth Amendment substantive due process claim against the City (Counts 2 and 3). However, BVCV's action against the individual Defendants in their official capacities will be dismissed because it is redundant of the suit against

36

the City.  Finally, the § 1983 constitutional claims supply an independent basis for the request for a declaratory judgment; however, the request for a declaratory judgment to the extent it is based on a state-law violation, will be dismissed.

Accordingly, it is ORDERED as follows:

(1)    Defendants' motion to dismiss (Doc. # 13) is DENIED as to Counts 2 and 3.

(2)    Defendants' motion to dismiss (Doc. # 13) is GRANTED as to the official capacity claims against Defendants John Chambers, Jerry Starnes, Blair Gornto, and Lora Lee Boone.  The Clerk of the Court is DIRECTED to terminate these Defendants as parties.

(3)    Defendants' motion to dismiss is GRANTED as to the declaratory judgment request predicated on a state-law violation (Count1), and is otherwise DENIED.

DONE this 29th day of August, 2022.

_____
/s/ W. Keith Watkins
UNITED STATES DISTRICT JUDGE